# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs January 7, 2014

## ERNEST LEE JENNINGS, III v. STATE OF TENNESSEE

### Appeal from the Circuit Court for Fayette County
### No. 6337    J. Weber McCraw, Judge

---

### No. W2013-01006-CCA-R3-PC  -  Filed April 17, 2014

---

The petitioner, Ernest Lee Jennings, III, appeals the denial of his petition for post-conviction relief, arguing that he received ineffective assistance of trial counsel and that the trial court erred in denying his motion to suppress and in admitting at trial evidence seized from his room.  Following our review, we affirm the denial of the petition.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. GLENN, J., delivered the opinion of the Court, in which D. KELLY THOMAS, JR. and ROGER A. PAGE, JJ., joined.

W. Erik Haas, Somerville, Tennessee, for the appellant, Ernest Lee Jennings, III.

Robert E. Cooper, Jr., Attorney General & Reporter; Brent C. Cherry, Senior Counsel; Mike Dunavant, District Attorney General; and Catherine Walsh, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## TRIAL PROCEEDINGS

The petitioner was convicted in the Fayette County Circuit Court of sexual exploitation of a minor and three counts of rape of a child.  The trial court sentenced him to an effective sentence of eighty-five years in the Department of Correction.  This court affirmed the petitioner's convictions and sentences on direct appeal, and our supreme court denied his application for permission to appeal.  See State v. Ernest Lee Jennings, No. W2010-01484-CCA-R3-CD, 2011 WL 3330244, at *1 (Tenn. Crim. App. Aug. 3, 2011),

perm. app. denied (Tenn. Nov. 15, 2011).

The evidence presented at trial was summarized by this court in our opinion on direct appeal as follows:

R.M.[1] testified that, at the time of these crimes, he was nine years old. R.M. explained that the Defendant was married to his aunt and that, at the time of these incidents, the couple had been living in the front room of the home R.M. lived in with his parents and brothers. R.M. recalled one day in particular when he and his brothers were at home alone with the Defendant. The Defendant told the other boys to go outside but told R.M. to stay in the house or "he would shoot [R.M.]." R.M. testified that he was scared of the Defendant and remained in the house. The Defendant handcuffed R.M. to the headboard and removed R.M.'s clothes. Describing what the Defendant next did, R.M. said the Defendant "put his wee-wee on my butt and made me suck his wee-wee and he done that to me, too." R.M. said that sperm, which was "white and gooey," came out of the Defendant's penis, and the Defendant wiped it away with a towel. The Defendant told R.M. that if R.M. told his mom and dad, the Defendant would kill R.M. R.M. testified these events occurred during the summer, while he was out of school, but he did not remember the specific month.

On cross-examination, R.M. agreed that the Defendant was a security guard and that the gun, handcuffs, and pepper spray in his bedroom were for the Defendant's job. R.M. described the Defendant's bed as having bars along the headboard and explained the Defendant handcuffed R.M. to these bars. R.M. testified that the Defendant showed him a gun during these events and told R.M. not to tell anyone. R.M. said that the first time he spoke of this incident with the Defendant was after he heard his cousin mention that the Defendant had engaged in similar behavior toward him. R.M. recalled that the Defendant overheard R.M. and his cousin talking about what the Defendant had done to them, and the Defendant said he was going to leave. After the Defendant left, R.M. told his parents what had occurred.

C.M., R.M.'s younger brother, who was eight at the time of these crimes, identified the Defendant in court and, when asked how he knew the Defendant, replied, "Cause he did nasty stuff to me." C.M. said that, in the spare bedroom, the Defendant, "Put sperm in my mouth and put his wee-wee

---

[1]It is the policy of this Court to refer to juvenile victims of sexual assault by their initials only.

in my butt." C.M. described the sperm as tasting like salt. C.M. said that the Defendant undressed himself and then removed C.M.'s clothes. C.M. said that this incident occurred during a school break, in the "morning time" while everyone else was at the store. C.M. said that the Defendant told C.M. not to tell anyone what had happened but did not threaten him.

T.W., R.M. and C.M.'s cousin who was six at the time of trial, identified the Defendant and testified that the Defendant "sucked [his] wee-wee" when he was visiting his cousins. He recalled that, when he and the Defendant were in the Defendant's room, the Defendant told T.W. to take his clothes off, and T.W. did so. The Defendant then told T.W. to suck his penis. T.W. testified that the Defendant "put [his penis] in my butt" and licked T.W.'s butt. T.W. said that he was scared, so he tried to "get away" and told the Defendant to stop. The Defendant told T.W. not to tell anyone what had occurred. T.W. said that these events occurred in the summer while he was out of school. During the summer, he would spend the night with his cousins and these events occurred during one of those occasions.

N.M., R.M. and C.M.'s older brother who was thirteen at the time of trial, confirmed that the Defendant lived in his home temporarily. He recalled that, in June of the previous year, N.M.'s grandmother had a mild heart attack, and the three boys stayed at home with the Defendant while their parents and aunt, the Defendant's wife, went to the hospital. While N.M.'s parents were gone, the Defendant told N.M.'s brothers to go outside. The Defendant told N.M. to come to the Defendant's room to watch television but instead showed N.M. a video on the Defendant's laptop of a man and a woman having sex. The Defendant then asked N.M., "Would you like to do that with me?" To which N.M. replied, "No." N.M. testified that the Defendant "tried to make me and I kept on telling him no . . . ." The Defendant threatened N.M. that, if he told anyone about what had occurred, he would shoot N.M. After being in the Defendant's room for about an hour, N.M. got up to leave, but the Defendant began to chase him, so he "started running around the room and unlocked the door and ran."

Chad Lawson, a Somerville Police Department Investigator, testified that, on September 3, 2009, he was dispatched to a residence where a possible child rape occurred. En route, Officer Lawson was notified that the Defendant was "at the jail trying to get in." Officer Lawson said that he continued to the residence to assess the situation before responding to the jail. After securing services for the children and assigning officers various duties, Officer Lawson

called the jail and instructed that the Defendant be "put [] in a room till [he] could get there."

Officer Lawson testified that the children were interviewed by forensic interviewers who specialize in talking with child victims. Officer Lawson watched the interviews from an observation room. Officer Lawson said that the children's in-court testimony was consistent with what they said in the forensic interviews.

After beginning the process of taking statements from witnesses, Officer Lawson went to the jail to meet with the Defendant. Officer Lawson said that he thought it "unusual" that the Defendant was "trying to get in the jail." Officer Lawson met with the Defendant in a room at the jail where he read the Defendant his Miranda rights and then took a statement from the Defendant. Officer Lawson recalled that he asked the Defendant why he came to the jail. The Defendant responded that, because he was an armed security guard, he preferred to turn himself in rather than be arrested at his place of work. Officer Lawson then asked the Defendant a series of questions, during which Officer Lawson took notes. The Defendant and Officer Lawson then initialed those notes, indicating they agreed with the content. Officer Lawson said that the statement did not represent the "entire conversation" but was a summary of the Defendant's responses to questions.

Reviewing his notes, Officer Lawson recalled that, when he asked the Defendant, "How did you get in jail," the Defendant responded, "When they started saying I had sexual contact with them, I left the house and turned myself in to the jail." The Defendant, however, denied having any sexual contact with the children. The Defendant told Officer Lawson that the children had "come on" to the Defendant.

Officer Lawson testified that, after he learned that the Defendant's wife had pawned the Defendant's laptop, he retrieved the laptop from the pawn shop. Pawn shop records indicated that the Defendant's wife pawned the computer on August 11, 2009. The pawn shop records further indicated that, on the same date, the Defendant pawned a Taurus .9 millimeter gun. After obtaining the laptop, Officer Lawson had the laptop analyzed.

Officer Lawson testified that he also conducted a search of the residence and recovered pornographic CDs and photographs from the night stand next to the bed in the Defendant's bedroom. Approximately 105 of the

photographs and the images recovered from the CDs were child pornography. In addition to those images, Officer Lawson recovered cartoons depicting sexual activity with children. Officer Lawson said that an Emachine, computer tower, and zip drives were also recovered from the residence and sent for analysis. Officer Lawson recalled that the Defendant's bedroom door was equipped with a lock and that he found a security guard uniform patch, condoms, and a dildo in the Defendant's room. The Defendant's wife denied owning the dildo. Officer Lawson also found firearms and a law enforcement "duty belt" with a baton, handcuffs, and a flashlight in the Defendant's vehicle.

On cross-examination, Officer Lawson agreed the Defendant disclosed in his interview that his wife had pawned his laptop and that pawn shop records confirmed the Defendant's laptop was pawned on August 11, and the police recovered it from the pawn shop on September 4. Officer Lawson testified that he did not search the home in which these crimes were alleged to have occurred until September 10. Even though the Defendant left the residence on September 3, the family remained in the residence from the time the Defendant turned himself in until the police searched the residence. Reviewing a photograph he took of the Defendant's bed, he agreed that there was not a headboard or any bars or boards at the head of the bed. Officer Lawson testified that the Defendant's wife and the victims' parents claimed no ownership of the pornographic pictures and CDs recovered from the Defendant's bedroom. Officer Lawson said that the CDs contained files with the Defendant's name on them. Officer Lawson agreed that, although it was possible to have the dildo tested for bodily fluids, this testing was not done. Likewise, police never attempted to recover fingerprints from the Defendant's handcuffs or any of the other items recovered. The Defendant told Officer Lawson that he and his wife moved into the house where these crimes occurred in November 2008 and remained there until he turned himself in at the jail on these charges in September 2009.

Steve Bierbrodt, a Shelby County Sherif[f]'s Office detective, testified as an expert in the field of computer forensics. Detective Bierbrodt said that Officer Lawson requested Detective Bierbrodt run a computer analysis on the Defendant's computers and review multiple CDs. The computer analysis of the laptop, zip drives, and the Emachine revealed nothing of evidentiary value to this case. The CDs, however, contained more than 100 individual, separate images of child pornography both in video format and still-frame pictures. Detective Bierbrodt also found files with pornographic images on the

Defendant's Gateway computer tower. One such picture was of a young nude boy with bandages on his body. Detective Bierbrodt said that he recovered this photograph from the computer's C-drive under "Pictures" with information indicating the Defendant's name and the file name "boys will be bois." The detective also found a picture of the Defendant on the C-drive within the "Pictures" file.

On cross-examination, Detective Bierbrodt agreed that he can tell when an item was created or modified but not who put the items on the CD.

Amber Jennings, the Defendant's wife, testified that she had been married to the Defendant for a year and three months. She met the Defendant through her mother, who worked for the Defendant. Jennings said that the Defendant first met her nephews when her sister brought them to see their grandmother at work. Jennings testified that she and the Defendant moved in with her sister on November 15, 2008, and remained there until September 2009 when the Defendant turned himself in on these charges. Jennings acknowledged that she was initially hostile to the officers investigating this case because she "didn't want to believe it."

Jennings described her marital relationship with the Defendant as "a little strange." In retrospect, she believed that the Defendant used her to access her nephews. When asked if she and the Defendant had "a sex life" during their marriage, she replied, "Not really." She explained that the Defendant "always" asked if her nephews could sleep in their room with them. When her nephews did so, the Defendant would ask Jennings to either sleep on the floor or "somewhere else." Jennings also said that when she had found her husband watching pornographic movies, she would ask the Defendant "why" he viewed these movies, but she never received an answer from him. She also noticed the Defendant looking in on the boys while they were bathing.

Jennings testified that she had access to the laptop but that she could not access certain files. Jennings said that, at the Defendant's request, she sold his laptop for $100 to a pawnshop on August 11, 2009. Jennings denied any knowledge of child pornography on the computers or in the night stand by their bed.

Jennings recalled that, on July 15, 2009, her mother had a heart attack and was taken to the hospital. Jennings, her sister, and her brother-in-law went to the hospital, leaving the Defendant to care for the three boys, N.M., C.M.,

and R.M.

Jennings recalled that the night the Defendant turned himself in, he had walked past N.M's bedroom and overheard N.M. and T.W. "saying something" that "set [him] off." Jennings said that the Defendant told her he was "just going to turn hi[m]self in." She said that she "didn't know what all was going on" because she did not hear what the boys had said.

On cross-examination, Jennings testified that she could not create files on the Defendant's laptop. She said she and the Defendant were expecting a baby at one point in their marriage but that she miscarried. She said that she moved out of her sister's residence in September 2009 and had not lived there since that time. Jennings agreed that she has visited with the Defendant during his incarceration for these charges.

Ernest Lee Jennings, 2011 WL 3330244, at *1-5.

## POST-CONVICTION PROCEEDINGS

Co-counsel, an assistant public defender, testified that she was appointed to represent the petitioner in the general sessions court. On the day of her appointment, co-counsel met with the petitioner and instructed him to not discuss the charges with anyone. Co-counsel also met with the petitioner before the preliminary hearing. She said she gave the petitioner copies of the victims' statements and discussed them with him. Co-counsel also said that the petitioner denied the allegations and that they discussed the seriousness of the charges and the possible penalties.

Co-counsel explained that the purpose of the preliminary hearing was to determine whether the testimonies of the victims would differ from their statements. Officer Chad Lawson and one of the victims testified at the preliminary hearing. During a bench conference, co-counsel viewed the contents of one of the DVDs recovered in connection with the petitioner's computer. She stated that the contents of the DVD included photographs that appeared to depict child pornography. Co-counsel was not provided copies of the photographs, but they were maintained in either the police file or the prosecutor's file.

After the petitioner was indicted, co-counsel was appointed to represent him in the trial court. She said she filed multiple pretrial motions, including a motion for change of venue, a motion to sever the offenses, and a motion to suppress. The trial court denied the motions. The motion to suppress challenged the search of the room that the petitioner and his wife had been renting in the home where some of the victims lived. Co-counsel stated

-7-

that any physical evidence came from this room.

Co-counsel did not recall the number of meetings that she had with the petitioner. She said she met with the petitioner at least twice before any court appearance to discuss what would occur. She also said she met with the petitioner on three or four occasions during the time period following the pretrial hearings and before trial. Co-counsel recalled that the petitioner consistently denied the allegations. Co-counsel stated that during the meetings, they discussed the testimony at the preliminary hearing, the defense strategy at trial, and plans to attempt to establish inconsistencies in the testimonies of the victims. The petitioner talked about his wife and what he believed her testimony would be. Co-counsel interviewed the petitioner's wife and said Mrs. Jennings' statement was not consistent with what the petitioner believed she would say. Co-counsel noted that the State presented Mrs. Jennings as a witness at trial and that her testimony was very harmful to the petitioner.

Co-counsel denied withdrawing from the petitioner's case before trial. She explained that once the public defender's office is appointed to a case, any attorney in the office may work on the case. Co-counsel noted that the petitioner's case was complex and involved multiple victims. As a result, lead counsel agreed to assist her on the case. Co-counsel said that she discussed lead counsel's participation with the petitioner and that the petitioner was "grateful" to have two attorneys representing him. Co-counsel and lead counsel agreed that lead counsel would assume the lead at trial and question the witnesses. Co-counsel sat beside the petitioner at trial and answered his questions. She said both her and lead counsel discussed the issues with the petitioner during trial.

Co-counsel did not believe that the petitioner testified at trial. She was certain that she discussed with the petitioner whether he should testify. She said she always informed her clients of the benefits and risks of testifying. Co-counsel explained that she generally advised her clients to wait to see how the trial was going before deciding whether to testify. She believed that in this case, the risk of damage that could have resulted from the petitioner's testifying outweighed any benefit.

On cross-examination, co-counsel said she believed that the victims testified well at trial. The defense was able to identify some contradictions. Co-counsel explained that they did not want to attack the child victims in front of the jury but sought to establish inconsistencies in their testimonies. She further explained that the issue was whether the jury believed the victims.

Co-counsel testified that she argued during the suppression hearing that the room where the petitioner was staying had a lock on it restricting access. The victims' parents, who owned the house where the petitioner was staying, consented to the search. The trial

court found that the petitioner did not have any privacy protection in the room. Other items were recovered in a pawnshop, including a laptop computer and DVDs or CDs in a computer case. The DVD shown at the preliminary hearing was from the computer case and appeared to show child pornography.

On redirect examination, co-counsel testified that some DVDs were seized from the petitioner's room. Co-counsel said the DVDs, along with all of the other items seized from the petitioner's room, were challenged in the motion to suppress.

Lead counsel, a senior assistant public defender, testified that she became involved in the petitioner's case following the hearings on the pretrial motions. She was aware of the case prior to that time and was involved in the planning aspects of the defense. Lead counsel said she likely first met the petitioner shortly after the pretrial hearings because that was the point where it appeared the case would go to trial. She said she met with the petitioner on three or four occasions. The petitioner also met with the investigator, and co-counsel continued to meet with him.

Lead counsel testified that she and the petitioner discussed his wife, Amber Jennings. Lead counsel and the investigator then interviewed Mrs. Jennings. Lead counsel said Mrs. Jennings was "elusive" and could not recall specific dates. Mrs. Jennings recalled that the petitioner liked to be with the victims outside of her presence. She told lead counsel that she would contact counsel regarding additional information but failed to do so. Lead counsel stated that when she contacted Mrs. Jennings about the additional information, Mrs. Jennings was not cooperative. Lead counsel later learned that Mrs. Jennings was involved with another man and believed this was a factor in Mrs. Jennings' lack of cooperation.

Lead counsel stated that she spoke to the petitioner's employer about the dates during which the petitioner was working and obtained his employment records. Lead counsel said she could not use the information to establish an alibi defense. Rather, the information that she obtained established that the petitioner was not working during the time periods that the victims alleged that the rapes occurred.

Lead counsel testified that she did not receive copies of all of the photographs in discovery. She was allowed to view the photographs and believed that they were maintained under seal in the trial court clerk's office. Lead counsel also interviewed the State's computer expert but did not seek funds to retain an expert for the defense.

Lead counsel said she spent many hours attempting to negotiate a plea agreement with the State. The petitioner requested a two-year sentence with lifetime supervision or probation. Lead counsel told the petitioner that this sentence was not available for the

offenses with which he was charged. Rather, the State was willing to agree to a twenty-five-year sentence at 100% for each of the child rape charges to be served concurrently. The petitioner declined to accept the offer.

Lead counsel testified that she and the petitioner discussed whether he would testify at trial. Lead counsel explained that she generally waited to see how the State's proof progressed at trial before making a recommendation as to whether a defendant should testify. There was an allegation that the petitioner engaged in similar misconduct in the past. The State issued a subpoena for the young man, and lead counsel told the petitioner that she expected the State to call the man as a rebuttal witness if the petitioner testified. Lead counsel said that after the State rested, she and co-counsel met with the petitioner and told him that they believed they had made some headway with the forensic computer expert in that he did not know who actually downloaded the pornography. Officer Lawson acknowledged that no DNA had been extracted from the items of a sexual nature seized from the petitioner's room to show that the petitioner had used those items. Lead counsel also believed that they had established inconsistencies in the victims' testimonies. She recommended that the petitioner not testify but said it was the petitioner's decision not to do so.

On cross-examination, lead counsel testified that she wrote a letter to the petitioner dated March 1, 2010, stating that the State had agreed to a plea offer of twenty-five years. Lead counsel told the petitioner that he could receive a sentence between eighty-three and eighty-seven years at 100% if convicted. She recommended that the petitioner accept the offer.

Lead counsel stated that one set of DVDs was seized from the petitioner's room and that another set was seized from the pawnshop. The DVDs had photographs of child pornography on them. She believed that photographs from the DVDs seized from the petitioner's room were shown at trial. Lead counsel explained that photographs of child pornography generally are kept under seal to protect the victims. She was allowed to view the images but was not allow to obtain copies of the images.

Lead counsel testified that the defense strategy was to establish inconsistencies in the victims' statements and to argue that there was no DNA evidence connecting the petitioner to the offenses. She recalled an issue regarding the headboard on the bed and whether it was as described by one of the victims. She noted that a photograph of the petitioner's room contradicted the testimony of one of the victims. Lead counsel cross-examined all but one victim. She explained that the victim's testimony was very detailed and that she did not want the jury to hear him repeat it.

The petitioner testified that he believed that the warrantless search of his room was unlawful. He stated that the door to his room had a lock and that only he and his wife had a key. The officers obtained consent to search the room from the owners of the house. The petitioner, however, felt that he had a right to privacy in the room. He stated that during the suppression hearing, Officer Lawson testified that he did not know whether there was a lock on the door but that Officer Lawson later produced a photograph of the lock.

The petitioner also complained of the admission of the photographs from the DVDs seized from his room. He said the DVDs collected from his room were backup copies from his computer and were rewritable. He further said Officer Lawson viewed the DVDs on his personal computer before giving them to the forensic computer expert and could have loaded the photographs on the DVDs. The petitioner maintained that other than the photograph of the bandaged child, there were no photographs of child pornography on his computer or his laptop. He further maintained that he received the photograph from an email and deleted it. He said Officer Lawson testified during the suppression hearing that the DVDs did not have any evidentiary value. The petitioner stated that the original complaint listed four DVDs but that six DVDs were presented at trial. He stated that counsel failed to object to the admission of the DVDs.

The petitioner testified that he did not view any of the photographs prior to trial. He noted that during the trial, one of the victims testified that the petitioner handcuffed him to the headboard on the bed and described the headboard as having "bars on it like a jail." The petitioner said a photograph showing that his bed did not have a headboard was not presented until Mrs. Jennings testified two or three hours into the trial.

The petitioner testified that he received little communication from counsel and met with them on only six or seven occasions. He said that following the suppression hearing, co-counsel moved to withdraw as counsel and that he did not know that co-counsel still was considered to be his counsel when lead counsel began representing him. The petitioner stated that once lead counsel began representing him, he only met with her. He maintained that he met with lead counsel the day after the pretrial hearings and did not meet with her again until one or two days before trial when lead counsel and the investigator discussed the plea offer with him. The petitioner said he told them that he did not commit the crimes and would not enter a plea.

The petitioner stated that the only defense witnesses whom he identified for counsel were his wife and his wife's mother. He said his wife's mother passed away before counsel could interview her. He explained that he wanted to withhold obtaining her statement until close to trial because he did not want the family knowing that she was assisting him. The petitioner said he asked counsel to obtain his employment records because he was working

on the days in which the victims said the incidents occurred. The petitioner further said counsel told him that she was unable to obtain the records in time for trial.

The petitioner acknowledged that at the end of the trial, counsel discussed with him whether he should testify. Counsel informed him of the possibility of opening the door to allow additional evidence that would harm him. The petitioner said he decided against testifying.

The petitioner complained that the State failed to establish who owned the dildo seized from his room and that trial counsel failed to object to its admission into evidence. He said counsel only questioned witnesses regarding whether any DNA evidence was on the item. The petitioner further said that DNA was taken from him at the jail upon his request but that no tests were performed. He explained that the condoms seized from his room were used with his wife because she had a miscarriage and was not supposed to become pregnant for six to eight months.

Following the evidentiary hearing, the post-conviction court entered an order denying the petitioner's request for relief. This appeal followed.

## ANALYSIS

The petitioner asserts that he received ineffective assistance of counsel. The petitioner asserts that the trial court erred in denying his motion to suppress and in admitting certain items into evidence during the trial. Post-conviction relief "shall be granted when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103 (2012). The petitioner bears the burden of proving factual allegations by clear and convincing evidence. Id. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Wiley v. State, 183 S.W.3d 317, 325 (Tenn. 2006). When reviewing factual issues, the appellate court will not reweigh the evidence and will instead defer to the post-conviction court's findings as to the credibility of witnesses or the weight of their testimony. Id. However, review of a post-conviction court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden

to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The reviewing court must indulge a strong presumption that the conduct of counsel falls within the range of reasonable professional assistance, see Strickland, 466 U.S. at 690, and may not second-guess the tactical and strategic choices made by trial counsel unless those choices were uninformed because of inadequate preparation. See Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

The petitioner argues that counsel were deficient in their representation, thereby prejudicing the outcome of his case, by failing to adequately meet with him and failing to investigate and prepare the case. In its order denying relief, the post-conviction court credited trial counsel's testimony and concluded that the petitioner had not met his burden of demonstrating that counsel were deficient or that he was prejudiced by any of counsel's alleged deficiencies in representation. We conclude that the record fully supports the findings and conclusions of the post-conviction court.

Counsel met with the petitioner on multiple occasions. Co-counsel filed various pretrial motions, including a motion to suppress evidence seized from the petitioner's room. Counsel interviewed witnesses, including the petitioner's wife, the petitioner's employer, and the State's forensic computer expert. Counsel obtained the petitioner's employment records

in exploring an alibi defense. They viewed photographs found on the DVDs taken from the petitioner's room and the pawnshop. Based upon their investigation, counsel decided upon and employed a defense strategy that involved identifying inconsistencies in the victims' statements and challenging any connection between the petitioner and evidence seized from his room. The petitioner has failed to show that counsel were deficient in their representation.

The petitioner contends that the trial court erred in denying his motion to suppress evidence seized from his room. He further contends that the trial court erred in admitting at trial photographs, DVDs, and other items seized from his room. These issues, however, are waived for failure to present them on direct appeal. See Tenn. Code Ann. § 40-30-106(g) (noting that a ground for post-conviction relief is waived "if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented").

## CONCLUSION

We conclude that the petitioner has failed to establish that he is entitled to post-conviction relief. Therefore, we affirm the judgment of the post-conviction court.

_____
ALAN E. GLENN, JUDGE

-14-